**EXHIBIT A**

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "Agreement") is made and entered into as of the Effective Date (as hereinafter defined) between 1917 HEIGHTS HOSPITAL LLC,, a Texas limited liability company ("Seller"), and Platinum Heights LLC located at 801 S HWY 78, STE207, WYLIE TX 75098, a Texas limited liability company or assigns ("Buyer").

### ARTICLE 1. PURCHASE AND SALE

Subject to the terms hereof and for the consideration hereinafter stated, Seller agrees to sell, and Buyer agrees to purchase the following:

(a)     Land. That certain tract or parcel of land situated in Harris County, Texas, being more particularly described on Exhibit "A" attached hereto and made a part hereof for all purposes, and having a street address of 1917 Ashland, Houston, Texas 77008, together all of Seller's right, title and interest in and to any improvements thereof, and all rights and appurtenances pertaining to the land, including any right, title and interest of Seller in and to adjacent public roadways, public alleys or easements (the "Land");

(b)     Improvements. All of Seller's right, title and interest in and to the improvements on the Land including, without limitation, the hospital facilities located thereon, the paved parking areas and driveways and other appurtenances (the "Improvements");

(c)     Personal Property. All fixtures and personal property owned by Seller located on or attached to the Land and Improvements (the "Personal Property");

(d)     Leases and Deposits. Seller's interest in all leases, subleases, licenses, occupancy agreements or other agreements and any amendments, modifications, or changes thereto (whether written or verbal, now or hereafter in effect) that grant a possessory right in and to any space in the Improvements or that otherwise have rights with regard to the use of the Improvements or the Land, if any, (the "Leases"), and all prepaid rents and deposits, security or otherwise, made by tenants holding the Leases (the "Deposits"); and

(e)     Intangibles. Seller's interest in any and all (i) contracts or agreements, such as maintenance, service or utility contracts, to the extent Buyer elects to take assignment thereof; (ii) third-party warranties, guaranties, indemnities and claims; (iii) licenses, permits or similar documents relating to the Land and Improvements; and (iv) all other items of intangible personal property, owned or held by Seller that relate in any way to the ownership, use, leasing, maintenance, service or operation of the Land or Improvements (the "Intangibles").

The Land, the Improvements, the Personal Property, the Lease and the Intangibles are hereinafter sometimes collectively referred to as the "Property."

## ARTICLE 2.
## SALES PRICE

The sales price ("Sales Price") of the Property shall be $49,500,000.00, payable in cash or immediately available bank funds at Closing.

## ARTICLE 3.
## EARNEST MONEY

3.1.    Title Company.  The title company (the "Title Company") to be used in connection with this Agreement is:

> **HUDSON TITLE GROUP**
> Attn: Jenita Carwile
> 604 B West White Street
> Anna, TX 75409
> Phone:  469-715-3380
> E-Mail:  jcarwile@hudsontitlegroup.com

3.2.    Deposit.  Within three (15) business days after the Effective Date, Buyer shall deposit the sum of $10,000.00 (the "Earnest Money") to be held by the Title Company as earnest money in accordance with the terms of this Agreement.  The Earnest Money shall be applied to the Sales Price of the Property at the Closing.

3.3.    Interest.  If requested by the Buyer, the Title Company shall hold the Earnest Money in one or more federally insured interest bearing account(s).  All interest accruing on the Earnest Money shall be for the benefit of Buyer.

## ARTICLE 4.
## TITLE AND SURVEY

4.1.    Title Commitment.  The parties hereby instruct the Title Company to deliver to Buyer and Seller within five (5) days after the Effective Date, a title commitment covering the Property indicating all exceptions, if any, to Seller's title (the "Title Commitment") and binding the Title Company to issue at the closing an Owner's Policy of Title Insurance issued by a title insurance company reasonably acceptable to Buyer on the standard form of policy prescribed by the Texas Department of Insurance and in the full amount of the Sales Price.

4.2.    Survey. Within five (5) business days after the Effective Date, Seller shall deliver to Buyer a copy of Seller's most recent survey of the Property (the "Existing Survey").  Prior to the expiration of the Due Diligence Period, Buyer may, at Buyer's expense, obtain an updated survey of the Property (the "Updated Survey").  If Buyer obtains the Updated Survey, Buyer shall

cause the Updated Survey to be certified to Seller, Buyer and the Title Company. The Updated Survey must be made in accordance with the: (i) ALTA/ACSM Land Title Survey standards, or (ii) Texas Society of Professional Surveyors' standards for a Category 1A survey under the appropriate condition.

4.3.    Title Review Period. Buyer shall have until ten (10) days (the "Title Review Period") after receipt of the Title Commitment (and legible copies of all instruments referred to in Schedule B and C of the Title Commitment) and the Existing Survey to notify Seller, in writing, of such objections as Buyer may have to anything contained in the Title Commitment or the Existing Survey Buyer shall also have until the earlier of (i) seven (7) days after receipt of the Updated Survey (if obtained) or (ii) the expiration of the Due Diligence Period (such earlier date, the "Supplemental Review Period") to notify Seller, in writing, of such objections as Buyer may have to anything contained in the Updated Survey that was not reflected in the Existing Survey. Any item contained in the Title Commitment or the Existing Survey to which Buyer does not object during the Title Review Period, or anything contained in the Updated Survey that was not reflected in the Existing Survey to which Buyer does not object during the Supplemental Review Period, shall be deemed a "Permitted Exception". Notwithstanding anything to the contrary provided for herein, Buyer shall not be obligated to object to any title encumbrances that can be removed solely by the payment of money, such as mortgages or statutory liens, which Seller agrees to remove by payment thereof from Seller's sale proceeds, and Seller shall convey title to the Property free and clear of any such encumbrances at Closing.

4.4.    Seller's Attempts to Cure. If within the Title Review Period Buyer delivers to Seller written objections as contemplated in Section 4.3 above, Seller may, but shall not be obligated to attempt to cure the objections; however, Seller shall not be required to incur any costs to do so. If within five (5) business days after the conclusion of the Title Review Period, Seller has not cured all objections of which Buyer gave written notice to Seller during the Title Review Period, then Buyer as its sole remedies may either (i) terminate this Agreement and receive a full refund of the Deposit or (ii) waive the objections and accept such title as Seller is able to convey (with each uncured objection being also deemed a "Permitted Exception"). Buyer's failure to elect either remedy within ten (10) days after the period described in the immediately preceding sentence shall be deemed to constitute Buyer's election to accept the status of Seller's title.

## ARTICLE 5.
## INSPECTION AND FEASIBILITY

5.1.    Inspection. Between the Effective Date hereof and the date of closing, Seller shall (subject to the rights of the tenants under the Leases) afford Buyer and its agents the opportunity to make full and complete inspection of the Property. All tests and inspections shall occur at times reasonably agreed to by Seller and Buyer and shall be conducted in a good and workmanlike manner, and in conformance with all applicable governmental and industry standards, with a minimum of damage to the Property. At the completion of each test or examination of the Property, the Property shall be returned as nearly as reasonably possible to its condition prior to all tests and examinations. Buyer agrees to indemnify and hold Seller harmless from and against any and all costs, expenses or liabilities arising from or in connection with Buyer's inspections or



examination of the Property, which indemnity shall survive closing or termination of this Agreement.

5.2.    Information Provided by Seller. Within five (5) business days after the Effective Date, Seller shall furnish to Buyer copies of the following documents relating to the Property, to the extent in Seller's possession or control:

(a)    All Leases, amendments and current rent roll certified as true and correct by Seller, and any and all information pertaining the Leases, including financial statements and tenant correspondence.

(b)    Any and all tax information related to the Property for 2018 and 2019.

(c)    Operating Statements (including historical capital expenditures) for 2018, 2019, 2020 and 20201 YTD.

(d)    Tenant NNN reconciliation letters for 2019 and 2020.

(e)    Any utility and service contracts covering the Property.

(f)    Copies of any and all engineering studies, environmental assessments, structural reports or inspections relating to the Property.

(g)    Copies of all certificates of occupancy, building permits and other required permits for the continued operation of the Property.

5.3.    Due Diligence Period. Buyer shall have until thirty (30) days after the Effective Date (the "Due Diligence Period") to inspect the Property. In the event Buyer, in its sole and absolute discretion, determines that the Property is not suitable for its purposes, Buyer may terminate this Agreement by delivering a written notice of termination to Seller within the Due Diligence Period. If Buyer fails to terminate this Agreement within the Due Diligence Period, the Property shall be deemed to be satisfactory to Buyer and the contingencies set forth above shall be deemed to be satisfied or waived. Upon delivery by Buyer of written notice of termination within the Due Diligence Period, this Agreement shall automatically terminate, and the Earnest Money shall be immediately refunded to Buyer, less the Non-Refundable Earnest Money to be delivered to and retained by Seller as independent consideration for this Agreement.

5.4.    Estoppel Certificates. Prior to the expiration of the Due Diligence Period, Seller shall obtain an estoppel certificate from each tenant under Leases (i) in such tenant's customary form if attached to and required by its Lease to be used, or (ii) substantially in the form of Exhibit "B" attached hereto (in either case, an "Estoppel Certificate").

5.5.    Audit Compliance. Seller shall be required to cooperate with Buyer, as the Property may be audited on a historical basis (from March 1, 2017 to current). The audit cost will be covered by Buyer but requires the cooperation of Seller's personnel and availability of records. The audit, which is limited in scope, is to be performed within 30 days after the Due Diligence period.

4

### ARTICLE 6.
### CLOSING

6.1.    Place and Date. Closing shall occur at the office of the Title Company on or before sixty (60) days after expiration of the Due Diligence Period (the "Closing Date"). Buyer shall have the option to extend the Closing Date for a period of up to thirty (30) days by depositing with the Title Company the sum of $100,00.00 (the "Additional Earnest Money") on or before the schedule Closing Date. The Additional Earnest Money shall be released as liquidated damages to Seller in the event of a default by Buyer or credited to the Sales Price at Closing.

6.2.    Seller's Responsibilities. At closing, Seller shall furnish the following to Buyer at Seller's sole cost and expense:

(a)    An Owner's Policy of Title Insurance issued by the Title Company in the full amount of the Sales Price, dated as of the Closing, insuring Buyer's fee simple title to the Property to be good and indefeasible subject only to the Permitted Exceptions, and the standard printed exceptions contained in the usual form of the Title Policy.

(b)    A Special Warranty Deed conveying to Buyer the Property, subject only to the Permitted Exceptions.

(c)    A Bill of Sale conveying to Buyer the Personal Property and the Intangibles.

(d)    An Assignment and Assumption of the Leases conveying to Buyer the rights of Seller as landlord under the Leases.

(e)    An Affidavit of Non-Foreign Status in accordance with Section 1445 of the Internal Revenue Code.

(f)    Evidence satisfactory to the Title Company of Seller's capacity and authority for closing this transaction.

(h)    Other documents reasonably requested by the Title Company as administrative requirements for closing this transaction.

6.3.    Buyer's Responsibilities. At closing, Buyer shall furnish the following to Seller at Buyer's sole cost and expense:

(a)    The Sales Price of the Property.

(b)    The Assignment and Assumption of the Leases described in Section 6.2 above whereby Buyer assumes Seller's obligations under the Lease.

(c)    Reasonable evidence (satisfactory to the Title Company) of Buyer's capacity and authority for closing this transaction.

5

(d)     Other documents reasonably requested by the Title Company as administrative requirements for closing this transaction.

6.4.    Prorations. Seller and Buyer shall prorate as of the close of business on the date of closing, all rents collected, prepaid rents, taxes, assessments, insurance premiums on policies assumed by Buyer, if any, and utility expenses. Any security deposits held by Seller shall be delivered to Buyer.

(a)     Taxes. If the Closing shall occur before the tax rate is fixed for the then current year, the apportionment of the taxes shall be upon the basis of the actual amount of taxes assessed against the Property for the previous year but any difference in the actual ad valorem taxes for the year of sale actually paid by Buyer shall be adjusted between the parties after the closing upon Seller's receipt of written evidence of the payment thereof.

(b)     Rents. If the Closing shall occur before rents and all other amounts payable by Tenants under the Lease (the "Rents") and all other income from the Property have actually been paid for the month in which the Closing occurs, the apportionment of such Rents. Rents in arrears will not be prorated but shall be paid to Seller by Buyer when and if collected by Buyer. The first monies received by Buyer from Tenant after the Closing Date shall be applied first to current Rents and thereafter shall be applied to Rents in arrears, if any.

6.5.    Closing Costs.

(a)     Seller's Costs. Seller shall pay for the basic premium for the Owner's Policy of Title Insurance, the cost of tax certificates, release of any liens on the Property granted by Seller, and Seller's attorney's fees.

(b)     Buyer's Costs. Buyer shall pay the premium for any endorsements or amendments to the standard exceptions in the Owner's Policy of Title Insurance, the recording fees for Deed, the Buyer's attorney's fees, any financing costs (including appraisal fees, lender's attorney's fees, and third party reports), and the Updated Survey obtained by Buyer (subject to the reimbursement specified in Section 4.2 hereof).

(c)     Shared Costs. Seller and Buyer shall each pay one-half (1/2) of any escrow fee charged by the Title Company.

## ARTICLE 7.
## REPRESENTATIONS, WARRANTIES AND COVENANTS

7.1     Express Warranties and Representations of Seller.  Seller makes the following warranties and representations to Buyer as of the Effective Date:

6

(a)    Organization and Authority. Seller has been duly organized and is validly existing and in good standing under the laws of the state of its formation and (if such state is other Texas) is qualified to transact business in the State of Texas, to the extent such qualification is necessary. Seller has the full right and authority to enter into this Agreement and the documents, instruments and agreements contemplated herein and to transfer all of the Property and to consummate or cause to be consummated the transaction contemplated by this Agreement. The person signing this Agreement and the documents, instruments and agreements contemplated herein on behalf of Seller is authorized to do so. The execution, delivery, and performance of this Agreement and all other documents, instruments, and agreements contemplated herein have been, or prior to the Closing Date shall be, duly authorized by all necessary liability company action.

(b)    Pending Actions. To Seller's Knowledge, except as otherwise disclosed by Seller to Buyer, Seller has not received written notice of any action, suit, arbitration, unsatisfied order or judgment, government investigation or proceeding pending against Seller which, if adversely determined, could individually or in the aggregate materially interfere with the consummation of the transaction contemplated by this Agreement.

(c)    Condemnation. To Seller's Knowledge, Seller has received no written notice of any condemnation proceedings relating to the Property which proceedings have not been completed prior to the Effective Date.

(d)    Leases. The Leases shown on the rent roll delivered to Buyer by Seller reflect all of the leases of space in or on the Property; to Seller's Knowledge there are no unrecorded leases or parties in possession affecting the Property other than under the Leases provided to Buyer pursuant to this Agreement; and the Seller has not assigned its rights in any of the Leases or the rents payable thereunder or any interest therein save and except pursuant to any existing mortgages, which shall be discharged on or prior to the Closing.

(e)    Terrorist Organizations Lists. Seller is not acting, directly or indirectly, for or on behalf of any Person named by the United States Treasury Department as a Specifically Designated National and Blocked Person, or for or on behalf of any person designated in Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism. Seller is not engaged in the transaction contemplated by this Agreement directly or indirectly on behalf of or facilitating such transaction directly or indirectly on behalf of, any such person.

(f)    No Violations. The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement (a) do not conflict with the Certificate of Formation of Seller, (b) do not violate, result in a breach of or constitute a default under any of the terms, conditions or provisions of any material contract which would have a

7



material adverse effect on the ability of Seller to complete the transactions contemplated by this Agreement, and (c) do not violate in any material respect any order, injunction or decree, or, to Seller's Knowledge any material statute, rule or regulations applicable to Seller.

(g)     Bankruptcy. The Buyer is aware of a possible Petition of Chapter 11 Bankruptcy Reorganization.

(h)     United States Person. Seller is a "United States person" (as defined in Section 7701(a)(30)(B) or (C) of the Code) for the purposes of the provisions of Section 1445(a) of the Code.

As used herein, "Seller's Knowledge" or similar words means the current, actual knowledge of Ryan Cole and Robert Day (the "Named Individuals"), without duty of inquiry or investigation, and without any liability of or on either or both of the Named Individuals.

If prior to the Closing or earlier termination of this Agreement, Seller obtains Seller's Knowledge that any of such warranties or representations is not true or has become inaccurate in any material respect, Seller shall promptly notify Buyer, in writing, of such new information, and such warranties and/or representations shall be deemed modified by such disclosure(s). Seller shall be deemed to have reaffirmed such warranties and representations (as so modified) as of the Closing Date. The representations and warranties of Seller set forth in this Section shall survive Closing for a period of twelve (12) months.

7.2.     Express Warranties and Representations of Buyer. Buyer warrants and represents to Seller as of the Effective Date that:

(a)     Organization. If Buyer is other than an individual, Buyer has been duly organized and is validly existing and in good standing under the laws of the state of its formation and (if such state is other Texas) is qualified to transact business in the State of Texas, to the extent such qualification is necessary. Buyer has the full right and authority to enter into this Agreement and the documents, instruments and agreements contemplated herein and to consummate or cause to be consummated the transaction contemplated by this Agreement. The person signing this Agreement and the documents, instruments and agreements contemplated herein on behalf of Buyer is authorized to do so. The execution, delivery, and performance of this Agreement by Buyer and all other documents, instruments, and agreements contemplated herein have been, or prior to the Closing Date shall be, duly authorized by all necessary action.

(b)     Terrorist Organizations Lists. Buyer is not acting, directly or indirectly, for or on behalf of any Person named by the United States Treasury Department as a Specifically Designated National and Blocked Person, or for or on

8



behalf of any person designated in Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism. Buyer is not engaged in the transaction contemplated by this Agreement directly or indirectly on behalf of or facilitating such transaction directly or indirectly on behalf of, any such person.

(c)     No Violations. The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement (a) do not conflict with the organizational documents of Buyer, (b) do not violate, result in a breach of or constitute a default under any of the terms, conditions or provisions of any material contract which would have a material adverse effect on the ability of Buyer to complete the transactions contemplated by this Agreement, and (c) do not violate in any material respect any order, injunction or decree, or, to Buyer's actual knowledge any material statute, rule or regulations applicable to Buyer.

(d)     Bankruptcy. No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under Federal or state bankruptcy or insolvency law is pending against or, to Buyer's actual knowledge, contemplated by Buyer.

The representations and warranties of Buyer set forth in this Section shall survive Closing for a period of twelve (12) months.

7.3 Seller's Covenants. Seller agrees that during the period from the Effective Date through the earlier of the Closing Date or termination of this Agreement, Seller will perform the following covenants:

(a)     Seller shall maintain, operate, manage and insure the Property in accordance with its customary operating practices existing on the Effective Date.

(b)     Seller shall not affirmatively encumber the Property with any encumbrance except as required by court order or as otherwise required by law, in which case Seller shall provide Buyer with immediate written notice.

(c)     The Property shall be free of hazardous materials and any spills or discharges of contaminated or hazardous waste on site.

## ARTICLE 8.
## DEFAULT

8.1.     Seller's Default. If Seller should wrongfully refuse to convey the Property or refuse to do or perform any of Seller's obligations hereunder, Buyer may, as its sole remedy for Seller's breach hereof, either (i) specifically enforce this Agreement and consummate the transaction contemplated hereby, or (ii) terminate this Agreement and receive a refund of the Earnest Money.

8.2.    Buyer's Default. If Buyer should fail, refuse or be unable to consummate this Agreement in accordance with the terms hereof, then Seller may, as Seller's sole remedy for Buyer's breach hereof, terminate this Agreement and receive the Earnest Money as liquidated damages, and the parties hereto shall be fully and finally released herefrom and Seller and Buyer hereby acknowledge that the Earnest Money is a reasonable estimate of damages that are impossible to determine and that the amount thereof bears a reasonable relationship to the damages which would be suffered by Seller as a result of having withdrawn the Property off the market, if Buyer defaulted hereunder.

## ARTICLE 9.
## MISCELLANEOUS

9.1.    Commissions. Any fees or real estate commissions incurred by the execution and/or consummation of this Agreement shall be the sole responsibility of the party contracting therefor and such party agrees to indemnify and hold harmless the other party from and against all claims, demands, liabilities, damages, costs, expenses and losses arising by virtue of any and all claims for such commissions. The Texas Real Estate License Act requires written notice to Buyer that it should have an attorney examine an abstract of title to the property being purchased or else a title insurance policy should be obtained. Notice to that effect is, therefore, hereby given Buyer. Buyer has disclosed to Seller that certain principals of Buyer are licensed real estate brokers in the state of Texas.

9.2.    Casualty and Condemnation. Seller shall provide immediate written notice to Buyer if any of the Improvements shall be destroyed or damaged or condemned prior to the Closing. If the estimated cost of repair or replacement or condemnation is an amount exceeding ten (10%) percent of the Sales Price of the Property, Buyer may, by written notice given to Seller within fifteen (15) days after receipt of written notice from Seller of such damage or destruction or condemnation, elect to terminate this Agreement, in which event the Earnest Money shall immediately be returned by the Title Company to Buyer and the rights, duties, obligations, and liabilities of all parties hereunder shall immediately terminate and be of no further force or effect. If Buyer does not elect to terminate this Agreement pursuant to this Section, or has no right to terminate this Agreement, and the sale of the Property is consummated, Buyer shall be entitled to receive all insurance proceeds or condemnation proceeds received by Seller by the date of Closing which shall be paid by Seller to Buyer at Closing. If the amount of said casualty insurance or condemnation proceeds is not settled by the date of Closing, Seller shall execute at or after Closing all proofs of loss, assignments of claim and other similar instruments in order that Buyer may receive all of Seller's right, title and interest in and under said insurance or condemnation proceeds. Seller shall also give Buyer a credit against the balance of the Sales Price due at Closing equal to the deductible applicable to such destruction or damage under Seller's insurance policy. If any of the Improvements shall be destroyed or damaged or condemned prior to the Closing, and the estimated cost of repair or replacement or condemnation is equal to or less than ten (10%) percent of the Sales Price of the Property, Buyer shall (despite such damage or destruction or condemnation) close and consummate the purchase of the Property on the terms provided in this Agreement, without any reduction, abatement or adjustment in the Sales Price. In such event, Buyer shall be entitled to receive all insurance proceeds or condemnation proceeds received by Seller by the date of Closing which shall be paid by Seller to Buyer at Closing. If the amount of

10

said casualty insurance or condemnation proceeds is not settled by the date of Closing, Seller shall execute at or after Closing all proofs of loss, assignments of claim and other similar instruments in order that Buyer receive all of Seller's right, title and interest in and under said insurance or condemnation proceeds. Seller shall also give Buyer a credit against the balance of the Sales Price due at Closing equal to the deductible applicable to such destruction or damage under Seller's insurance policy.

9.3.    Notices. All notices, demands and requests which may be given or which are required to be given by either party to the other, and any exercise of a right of termination provided by this Agreement, shall be in writing and shall be deemed effective when either: (i) personally delivered to the intended recipient; (ii) sent, by certified or registered mail, return receipt requested, addressed to the intended recipient at the address specified on the signature page hereof; (iii) delivered in person to the address set forth on the signature page hereof for the party to whom the notice was given; (iv) deposited into the custody of a nationally recognized overnight delivery service such as Federal Express, addressed to such party at the address specified on the signature page hereof; or (v) sent by facsimile provided that receipt for such facsimile is verified by the sender and followed by a notice sent in accordance with one of the other provisions set forth above. Notices shall be effective on the date of delivery or receipt, or if delivery is not accepted, on the earlier of the date that delivery is refused or three (3) days after the notice is mailed. For purposes hereof, the addresses of the parties for all notices are as set forth on the signature page hereof (unless changed by similar notice in writing given by the particular person whose address is to be changed).

9.4.    Business Days. Whenever any determination is to be made or action to be taken on a date specified in this Agreement, if such date shall fall upon a Saturday, Sunday or holiday observed by national banks, the date for such determination or action shall be extended to the first business day immediately thereafter.

9.5.    Entire Agreement. This Agreement contains the entire agreement between the parties with respect to the matters to which it pertains and may be amended only by written agreement signed by Buyer and Seller and by reference made a part hereof.

9.6.    Binding Effect. The terms and provisions of this Agreement shall inure to the benefit of, and be binding upon, Buyer and Seller and their respective heirs, legal representatives, successors and assigns. Buyer may assign its rights and obligations pursuant to this Agreement to any affiliate of Buyer.

9.7.    Effective Date. Time is of the essence hereof. For purposes of calculation of all time periods mentioned herein the effective date of this Agreement (the "Effective Date") shall be the date upon which the Title Company receives a fully executed copy of this Agreement.

9.8.    Governing Law and Forum. This Agreement shall be construed and interpreted in accordance with the laws of the State of Texas and the obligations of the parties hereto are and shall be performable in the county where the Land is located. Venue for any disputes between the parties hereof shall be any state or federal located in Harris County, Texas, to the exclusion of any other venue.

11

9.9.    No Oral Modification. This Agreement may not be modified or amended, except by an agreement in writing signed by both the Seller and the Buyer.

9.10.   No Oral Waiver. The parties may waive any of the conditions contained herein or any of the obligations of the other party hereunder, but any such waiver shall be effective only if in writing and signed by the party waiving such conditions or obligations.

9.11.   Attorneys' Fees. In the event it becomes necessary for either party hereto to file a suit to enforce this Agreement or any provisions contained herein, the party prevailing in such action shall be entitled to recover, in addition to all other remedies or damages, reasonable attorneys' fees and court costs incurred by such prevailing party in such suit.

9.12.   Headings. The descriptive headings of the various Articles and Sections contained in this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

9.13.   Warranties. No representation, warranty, covenant, agreement or condition not expressed in this Agreement shall be binding upon the parties hereto or shall affect or be effective to interpret, change or restrict the provisions of this Agreement.

9.14.   Partial Invalidity. If any clause or provisions of this Agreement is or should ever be held to be illegal, invalid or unenforceable, then it is the intention of the parties hereto that the remainder of this Agreement shall not be affected thereby, and that in lieu of each such illegal, invalid or unenforceable clause or provision, there be added as a part of this Agreement a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

9.15.   1031 Exchange. Either party shall have the right to include this transaction as part of a 1031 tax deferred exchange. Each party agrees to cooperate with the other party to effectuate any such 1031 exchange; provided, however, the other party shall not be required to incur any expense or liability as a result of same.

9.16.   Counterpart Execution. To facilitate execution, this Agreement may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of all persons required to bind any party appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Agreement to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

*[signatures on following pages]*

12



EXECUTED IN MULTIPLE ORIGINAL COUNTERPARTS, each of which shall be an original, but which together shall constitute but one and the same instrument.

**SELLER:**

1917 HEIGHTS HOSPITAL, LLC

*Robert Day*

By: Robert Day (May 21, 2021 17:10 CDT)

Name: Robert Day
Title: Manager

Date: May 21, 2021

Address:

13111 Westheimer Rd. Suite 450 Houston Texas 77077

Telephone: 713.702.2002
Fax:
Email: jrobertday@gmail.com

By: _____

Name: Dharmesh Patel
Title: Manager

Date: May 28, 2021

Address:
7811
98122 Katy Freeway
Suite 1060
Houston, Texas 77024

Telephone: 713.590.0640
Fax: 866.865.0063
Email: dpatel@amdglobal.com

13



**BUYER:**

Platinum Heights LLC,
a Texas limited liability company
And/or its assignee

By: _____
    Ryan Cole, CEO

Date: __5-28-21__ , 2021

Address:
801 S HWY 78
Suite 307
Wylie TX 75098 .
Telephone: 815-520-8686
Email: ryan@platinumteam.org

*With a copy to:*

Carpenter & Associates
Attn: Joshua Carpenter
101 East Park Blvd
Suite 1150
Plano TX 75074
Telephone: 972-455-8700
Fax: 972-807-3837
Email: josh@carplawfirm.com

14

## EXHIBIT "A"

### LEGAL DESCRIPTION

**TRACT 1: PARCEL A (fee simple)**

Being a tract or parcel of land containing 0.6767 acre (29,475 square feet) of land situated in the John Austin Survey, Abstract No. 1, Harris County, Texas, being all of Lots 1 through 9 of Block Eighty Four (84), Carter Reserve, a subdivision plat of record in Volume (Vol.) 75 Page (Pg.) 412 of the Harris County Deed Records (H.C.D.R.), same being all of a tract of land (Tract I-Parcel A) conveyed to Select Houston Partners, L.P. as described in deed recorded under Harris County Clerk's File Number (H.C.C.F. No.) U701477, said 0.6767 acre tract being more particularly described as follows (bearings herein are based on Houston Heights, a subdivision plat of record in Vol. 1A Pg. 114 of the Harris County Map Records (H.C.M.R.):

BEGINNING at a 5/8-inch iron rod with plastic cap stamped "Terra Surveying" set marking the intersection of the south Right-of-Way (R.O.W.) line of W. 21st Street (called 70 feet wide) as recorded in Vol. 75 Pg. 412 H.C.D.R. with the west R.O.W. line of Ashland Street (called 70 feet wide) as recorded in Vol. 75 Pg. 412 H.C.D.R., same being the northeast corner of said Lot 1 of Block 84 and of the herein described tract;

THENCE, South, departing said south R.O.W. line of said West 21st Street and along the west R.O.W. line of said Ashland Street, a distance of 131.00 feet to a point for the intersection of said west R.O.W. line with the north R.O.W. line of a 38.00 feet wide Public Alley as recorded Vol. 75 Pg. 412 H.C.D.R., same being the southeast corner of said Lot 1 of Block 84 and of the herein described tract, from which a found 3/4-inch iron rod bears North 74°40' West, 0.23 feet;

THENCE, West, departing the west R.O.W. line of said Ashland Street and along the north R.O.W. line of said Public Alley, a distance of 225.00 feet to a Magnetic (Mag.) Nail with shiner stamped "Terra Surveying" set marking the southeast corner of Lot 10 of said Block 84, same being the southwest corner of the aforesaid Lot 9 and marking the southwest corner of the herein described tract;

THENCE, North, departing the north R.O.W. line of said Public Alley, along the common line of said Lot 9 and Lot 10, a distance of 131.00 feet to a Mag. Nail with shiner stamped "Terra Surveying" set in the south R.O.W. line of the aforesaid W. 21st Street, same marking the common north corner of said Lot 9 and Lot 10 and also being the northwest corner of the herein described tract;

THENCE, East, along the south R.O.W. line of said West 21st Street, a distance of 225.00 feet to the POINT OF BEGINNING and CONTAINING 0.6767 acre (29,475 Sq. Ft.) of land. This description is based on a Land Title Survey prepared by Terra Surveying Company, Inc., dated September 16, 2016, latest revisions dated January 31, 2017, TSC Project Number 1851-0924.

**TRACT 1: PARCEL B (fee simple)**

Being a tract or parcel of land containing 0.5263 acre (22,925 square feet) of land situated in the John Austin Survey, Abstract No. 1, Harris County, Texas, being all of Lots 42 through 48 of Block Eighty Four (84), Carter Reserve, a subdivision plat of record in Volume (Vol.) 75 Page (Pg.) 412 of the Harris County Deed Records (H.C.D.R.), same being all of a tract of land (Tract I-Parcel B) conveyed to Select Houston Partners, L.P. as described in deed recorded under Harris County Clerk's File Number (H.C.C.F. No.) U701477, said 0.5263 acre tract being more particularly described as follows (bearings herein are based on Houston Heights, a subdivision plat of record in Vol. 1A Pg. 114 of the Harris County Map Records (H.C.M.R.):

COMMENCING for reference at the intersection of the north Right-of-Way (R.O.W.) line of W. 20th Street (called 70 feet wide) as recorded in Vol. 75 Pg. 412 H.C.D.R. with the west R.O.W. line of Ashland Street (called 70 feet wide) as recorded in Vol. 75 Pg. 412 H.C.D.R., same being the southeast corner of Lot 50 of said Block 84;

THENCE, West, departing the west R.O.W. line of said Ashland Street and along the north R.O.W. line of W. 20th Street, a distance of 50.00 feet to a 5/8-inch iron rod with plastic cap stamped "Terra Surveying" set marking the common south corner of Lot 49 and Lot 48 of said Block 84, the POINT OF BEGINNING and southeast corner of the herein described tract, from which a found 1/2-inch iron rod bears North 84°07' West, 3.29 feet;

THENCE, West, continuing along the north R.O.W. line of said W. 20th Street, a distance of 175.00 feet to an "X" cut in concrete set marking the common south corner of Lot 41 and Lot 42 of said Block 84 and the southwest corner of the herein described tract, from which a found 5/8-inch iron rod bears North 84°13' West, 3.02 feet;

THENCE, North, departing the north R.O.W. line of said W. 20th Street, Along the common line of said Lot 41 and Lot 42, a distance of 131.00 feet to a Magnetic (Mag.) Nail with shiner stamped "Terra Surveying" set in the south R.O.W. line of 38 feet wide Public Alley as recorded in Vol. 75 Pg. 412 H.C.D.R., same marking the common north corner of said Lot 41 and Lot 42 and also marking the northwest corner of the herein described tract;

THENCE, East, along the south R.O.W. line of said Public Alley, a distance of 175.00 feet to a point for the common north corner of the aforesaid of Lot 49 and Lot 48, same being the northeast corner of the herein described tract, from which a found 1-inch iron pipe (Bent) bears North 23°18' West, 0.42 feet;

THENCE, South, departing said south R.O.W. line of said Public Alley and along the common line of Lot 49 and Lot 48, a distance of 131.00 feet to the POINT OF BEGINNING and CONTAINING 0.5263 acre (22,925 square feet) of land. This description is based on a Land Title Survey prepared by Terra Surveying Company, Inc., dated September 16, 2016, latest revisions dated January 31, 2017, TSC Project Number 1851-0924.

### TRACT 2 (fee simple)

Being a tract or parcel of land containing 2.142 acres (93,301 square feet) of land situated in the John Austin Survey, Abstract No. 1, Harris County, Texas, being out of and a portion the remainder

of a 29 feet wide alley, a portion of Lot 39 and all of Lots 40 through 50 of Block Ninety One (91), Houston Heights, a subdivision plat of record in Volume (Vol.) 1A Page (Pg.) 114 of the Harris County Map Records (H.C.M.R.) and all of Lots 1 through 12 and out of and a portion of Lots 13 through 15 of Block Ninety One (91), Carter Reserve, a subdivision plat of record in Volume (Vol.) 75 Page (Pg.) 412 of the Harris County Deed Records (H.C.D.R.), same being all of a called 93,202 square foot tract of land (Tract II) conveyed to Select Houston Partners, L.P. as described in deed recorded under Harris County Clerk's File Number (H.C.C.F. No.) U701477, said 2.142 acre tract being more particularly described as follows (bearings herein are based on said Houston Heights):

BEGINNING at a found "X" cut in concrete marking the intersection of the south Right-of-Way (R.O.W.) line of W. 20th Street (called 70 feet wide) as recorded in Vol. 75 Pg. 412 H.C.D.R. with the west R.O.W. line of Ashland Street (called 70 feet wide) as recorded in Vol. 1A Pg. 114 H.C.M.R. and in Vol. 75 Pg. 412 H.C.D.R., same being the northeast corner of said Block 91 and of the herein described tract;

THENCE, South, departing said south R.O.W. line of said West 20th Street and along the west R.O.W. line of said Ashland Street, a distance of 292.00 feet to a 5/8-inch iron rod with plastic cap stamped "Terra Surveying" set marking the intersection of said west R.O.W. line with the north R.O.W. line of West 19th Street (called 86 feet wide) as recorded in Vol. 1A Pg. 114 H.C.M.R., same marking the southeast corner of said Block 91 and of the herein described tract;

THENCE, West, departing the west R.O.W. line of said Ashland Street and along the north line of said West 19th Street, a distance of 290.78 feet (called 290.50 feet) to a found 5/8-inch iron rod marking the southeast corner of the remainder of a tract of land conveyed to the City of Houston as described in deed recorded in Vol. 450, Pg. 464 H.C.D.R., same being in the south line of the aforesaid Lot 39 and marking the most southerly southwest corner of the herein described tract, from which a found 3/4-inch iron rod bears North 31°41' West, 0.24 feet;

THENCE, departing the north R.O.W. line of said West 19th Street, over and across the aforesaid Block 91, same being along the east lines of the remainder of said City of Houston tract, the following six (6) courses;

North 00°01'31" West, a distance of 132.00 feet to a 5/8-inch iron rod with plastic cap stamped "Terra Surveying" set marking an angle point;

West, a distance of 7.64 feet (called 7.66 feet) to an "X" cut in concrete set marking the most westerly southwest corner of the herein described tract;

North 16°23'06" West, a distance of 35.62 feet (called 35.56) to a found "X" cut in concrete marking angle point of the herein described tract, from which a found "X" cut in concrete bears, South 12°17' West, 0.34 feet;

North 47°08'19" West, a distance of 67.41 to an "X" cut in concrete set marking an angle point of the herein described tract;

Exhibit "A" – Page 3

South 89°58'29" West, a distance of 7.93 feet to a point for the most westerly northwest corner of the herein described tract, from which a found 5/8-inch iron rod with plastic cap stamped "Huitt Zollars" bears South 22°47' West, 0.26 feet;

North 00°01'31" West, a distance of 79.98 feet (called 80.00 feet) to a point in the south R.O.W. line of the aforesaid West 20th Street, same being in the north line of the aforesaid Block 91, being the northeast corner of the remainder of said City of Houston Tract and most northerly northwest corner of the herein described tract, from which a found 5/8-inch iron rod bears North 02°02' East, 0.22 feet;

THENCE, East, along the south R.O.W. line of said West 20th Street, a distance of 365.91 feet (called 365.50 feet) to the POINT OF BEGINNING and CONTAINING 2.142 acres (93,301 Sq. Ft.) of land. This description is based on a Land Title Survey prepared by Terra Surveying Company, Inc., dated September 16, 2016, latest revisions dated October 3, 2016, TSC Project Number 1851-0924.

### TRACT 3 (fee simple)

Being a tract or parcel of land containing 0.6015 acre (26,200 square feet) of land situated in the John Austin Survey, Abstract No. 1, Harris County, Texas, being all of Lots 18 through 25 of Block Ninety (90), Carter Reserve, a subdivision plat of record in Volume (Vol.) 75 Page (Pg.) 412 of the Harris County Deed Records (H.C.D.R.), same being all of a tract of land (Tract III) conveyed to Select Houston Partners, L.P. as described in deed recorded under Harris County Clerk's File Number (H.C.C.F. No.) U701477, said 0.6015 acre tract being more particularly described as follows (bearings herein are based on Houston Heights, a subdivision plat of record in Vol. 1A Pg. 114 of the Harris County Map Records (H.C.M.R.):

BEGINNING at a Magnetic (Mag.) Nail with shiner stamped "Terra Surveying" set marking the intersection of the south Right-of-Way (R.O.W.) line of W. 20th Street (called 70 feet wide) as recorded in Vol. 75 Pg. 412 H.C.D.R. with the east R.O.W. line of Ashland Street (called 70 feet wide) as recorded in Vol. 75 Pg. 412 H.C.D.R., same being the northwest corner of Lot 25 of said Block 90 and of the herein described tract;

THENCE, East, departing the east R.O.W. line of said Ashland Street and along the south R.O.W. line of said W. 20th Street, a distance of 200.00 feet to a found 5/8-inch iron rod marking the common north corner of Lot 17 and Lot 18 of said Block 90, same being the northeast corner of the herein described tract;

THENCE, South, departing said south R.O.W. line of said W. 20th Street and along said common line, a distance of 131.00 feet to a 5/8-inch iron rod with plastic cap stamped "Terra Surveying" set in the north R.O.W. line of a 29 feet wide Public Alley as recorded in Vol. 1A Pg. 114 of the H.C.M.R., same marking the common south corner of said Lot 17 and Lot 18 and the southeast corner of the herein described tract;

THENCE, West, continuing along the north R.O.W. line of said Public Alley, a distance of 200.00 feet to a found 5/8-inch iron rod set marking the intersection of the north R.O.W. line of said Public



Alley with the east R.O.W. line of the aforesaid Ashland Street and marking the southwest corner of the herein described tract;

THENCE, North, departing the north R.O.W. line of said Public Alley and along the east R.O.W. line of said Ashland Street, a distance of 131.00 feet to the POINT OF BEGINNING and CONTAINING 0.6015 acre (26,200 square feet) of land. This description is based on a Land Title Survey prepared by Terra Surveying Company, Inc., dated September 16, 2016, latest revisions dated January 31, 2017, TSC Project Number 1851-0924.

**TRACT 4 (easement estate)**

Easement Estate as created in Reciprocal Easement Agreement for a tunnel under 20th Street as recorded in the Office of the Harris County Clerk under File No. RP-2017-94256, over and across a tract or parcel of land containing 0.0198 acre (862 square feet) of land situated in the John Austin Survey, Abstract No. 1, Harris County, Texas, being out of and a portion of West 20th Street (called 70 feet wide) as recorded in Volume (Vol.) 75, Page (Pg.) 412 Harris County Deed Records (H.C.D.R.), said 0.0198 acre tract being more particularly described as follows (bearings herein are based on Houston Heights, a subdivision plat of record in in Vol. 1A Pg. 114 Harris County Map Records):

COMMENCING, for reference at a point in the north line of Lot 15 of Block Ninety One (91), Carter Reserve, a subdivision plat of record in Volume (Vol.) 75 Page (Pg.) 412 of the Harris County Deed Records (H.C.D.R.), same being the northwest corner of a called 93,202 square foot tract of land (Tract II) conveyed to Select Houston Partners, L.P. as described in deed recorded under Harris County Clerk's File Number (H.C.C.F. No.) U701477, from which a found 5/8-inch iron rod North 02°02' East, 0.22 feet;

THENCE, East, along the south R.O.W. line of said West 20th Street, a distance of 20.56 feet to the POINT OF BEGINNING southwest corner of the herein described tract;

THENCE, North 12°56'30" East, over and across the R.O.W. of said West 20th Street a distance of 71.82 feet to a point in the south line of Block 84 of said Carter Reserve, same being in the north R.O.W. line of said West 20th Street and being the northwest corner of the herein described tract;

THENCE, East, along the north R.O.W. line of said West 20'" Street, a distance of 12.31 feet to a point for the northeast corner of the subject tract;

THENCE, South 12°56'30" West, over and across the R.O.W. of said West 20th Street, a distance of 71.82 feet to a point in the south ROW line of said West Street, same being in the north line of the aforesaid Tract II and being the southeast corner of the herein described tract;

THENCE, West, along the south R.O.W. line of said West 20th Street, a distance of 12.31 feet and CONTAINING 0.0198 acres (862 sq. ft.) of land.

## EXHIBIT "B"

### TENANT ESTOPPEL

Property Address:

Lease Date:

Lease Commencement Date:

Lease Expiration Date:

Dates of Amendments or Modifications:

Landlord:

Tenant:

Leased Square Footage:

Monthly Base Rental (excluding Additional Charges):

Security Deposit Paid:

Current Monthly Additional Charges:

Amount of Financial Reimbursements owed from Landlord, if any:

The undersigned states that he/she is fully authorized on behalf of the Tenant in the above-described Lease to execute this letter and hereby certifies to the Landlord and to any future Buyer or owner of the Property the information set forth herein is true and accurate:

1.      The Lease is in full force and effect; there are no other promises, agreements, understandings or commitments between Landlord and Tenant relating to the Leased Premises; and Tenant is open for business and in operation in the Leased Premises and has not given Landlord any notice of termination thereunder.

2.      To the best of Tenant's knowledge and belief, no uncured default, event of default, or breach by Landlord or Tenant currently exists under the Lease. Tenant has made no claim against Landlord alleging Landlord's default under the Lease.

3.      Tenant is obligated to pay rent to Landlord at the rate set forth in the Lease. Tenant has not prepaid any rent or other amounts to Landlord other than rent and other charges due and payable in the calendar month of this certification.

Exhibit "B" – Page 1

4.     In connection with its use and occupancy of the Leased Premises, Tenant is not and will not become engaged in the production, treatment, release or storage of hazardous or toxic substances which pose a substantial risk of imminent damage to public health or safety or to the environment.

5.     Tenant is not currently a debtor in any bankruptcy, reorganization, arrangement or insolvency proceedings.

6.     Tenant has received no notice of prior sale, transfer, assignment, hypothecation or pledge of the said Lease or of the rents secured therein, except to above described Lender.

7.     Tenant has no options, rights of first refusal, termination, or exclusive business rights except as follows:_____.

**TENANT:**

By:_____
Name:_____
Title: _____

Exhibit "B" – Page 2

**Addendum to Real Estate Contract**

Be it known, on this day, May 25, 2021, 1917 Hospital, LLC, "Seller," and Platinum Heights, LLC, "Buyer," have made and agreement to sell the property located at 1917 commonly referred to as "Heights Hospital," with an address of 1917 Ashland, Houston, Texas 77008 (the "Property"), have agreed to a purchase price of $49,500,000.00 ("Purchase Price"), in a Purchase Agreement, which is incorporated by reference and fully stated herein, for a fee simple absolute title in the Property, provide the following addendum to the Real Estate Contract:

Whereas, Buyer understands and acknowledges that Seller is and will declare relief from its debts and liabilities under the protection afforded by Chapter 11 of the Bankruptcy Code of the United States of America, Buyer unconditionally agrees to purchase the Property for the Purchase Price, regardless, after the feasibility period, which ends, 30 days from the execution of this Addendum.

Buyer understands and acknowledges that this agreement is enforceable in Bankruptcy and under the laws of the State of Texas, and acknowledges that it will purchase the Property for the Purchase Price after the 30 day feasibility period, regardless of whether or not Buyer declares bankruptcy.

Agreed to in Substance and Form:

Authorized Representative of Buyer:

Ryan Cole, CEO of Buyer

Authorized Representatives of Seller:

Dharmesh Patel, M.D., Manager of Seller

Robert Day, Manager of Seller

## Second Addendum to the Purchase and Sales Agreement

Whereas, the Purchaser and Seller (collectively, the "Parties") executed the Purchase and Sales Agreement, together with the Addendum to Real Estate Contract (collectively, the "Sales Agreement") for the sale of the asset known as the Heights Hospital (the "Property");

Whereas, the Sales Contract contains a $49,500,000.00 purchase price;

Whereas, the Sales Contract provides for a Feasibility Period;

Whereas, the Sales Contract requires a $100,000.00 earnest money deposit, of which only $10,000.00 has been deposited with the requisite title company and the remaining $90,000.00 of Hudson Title is due; with 3 business days of this executed addendum.

Whereas, Purchaser asserts that it desires to adjust the purchase price for various reasons, including to accommodate for necessary repairs and renovations to the Property it has learned about during the Feasibility Period and extends the Feasibility Period 30 days from this extension;

Whereas, Seller advised Purchaser that (i) Seller is currently a debtor-in-possession in its pending Chapter 11 bankruptcy proceeding and (ii) that the bankruptcy sales process requirements augment the general traditional sale terms for a transaction of this nature, including requiring a fixed purchase price that is sufficient in dollar amount for the Seller to use to pay and satisfy in full all allowed secured claims, all allowed bankruptcy administrative expenses (including United States Trustee Fees), all allowed unsecured claims (priority and non-priority), because the equity interest holders of the Seller will receive equity and other value as part of this sales transaction;

Whereas, Purchaser desires to purchase the Property, to pay a fixed purchase price at closing, and for the purchase price to be sufficient in dollar amount so that all allowed claims of the Seller can be paid in full with the purchase price funds and the Seller's equity interest holders to receive equity and value from Purchaser;

Whereas, because of the early stage of the Seller's Chapter 11 bankruptcy proceeding, the exact total dollar amount of all such allowed pre- and post-petition claims is not currently known, but it can be estimated. Additionally, the proof of claim bar date has not expired;

Whereas, because of the Parties' sale terms and the required bankruptcy sales process, the Parties agree to set a fixed purchase price to be paid by or on behalf of Purchaser at closing to Seller that is sufficient to pay all allowed claims against the Seller and to agree to a "true-up" process to occur post-closing, which can result in one of three possible outcomes by Bankruptcy Court order – (i) the ultimately allowed claims against the Seller are less than the purchase price paid at closing and the Purchaser would receive a refund of that difference; (ii) the ultimately allowed claims against the Seller are more than the purchase price paid at closing and the Purchaser must pay additional funds to the Seller of that difference; (iii) the ultimately allowed claims against the Seller are in the exact same dollar amount as the fixed purchase price paid at closing and no additional money is owed to or from either Party;

1

Whereas, the Parties acknowledge that the Section 363 sales motion and order (or in the event that the sale is Court approved through a Chapter 11 plan confirmation, then the plan and confirmation order) will control the contemplated "true-up" process and that the purpose of this Second Addendum is to simply memorialize the general understanding between the Parties of this process; and

Whereas, the Sales Contract and all addendums and related transaction terms are subject to Bankruptcy Court approval.

It is therefore, agreed to as follows:

i.    The Purchase Price is $38,688,485.39.

ii.   Purchaser shall deposit the $90,000.00 in earnest money with the title company within three (3) days of the execution of this Second Addendum.

iii.  The Purchase Price is to be paid by or on behalf of Purchaser to Seller at closing.

iv.   The Purchase Price was negotiated at arms-length and in a good faith effort to properly estimate the allowed current and future claims against the Seller, the Parties did not seek to purposely undervalue such estimated claims, but instead sought to overvalue such claims based upon the current assertions by the claimants in an effort to ensure that the purchase price paid at closing is sufficient to pay all current and future anticipated allowed claims.

v.    As of the date of this Second Addendum, the Parties estimate that the purported face value of the asserted current claims and anticipated future claims are as follows: **$36,591,077.40 in secured claims; $ 300,000.00 in administrative claims (including estimated future United States Trustee Fees; $ 10,956.17 in priority tax claims; and $1,786,451.82 in general unsecured claims**. It is understood by the Parties that certain claims are likely entitled to pre- and post-petition interest, fees and the like and that between the time of the execution of this Second Addendum and the ultimate determination of the claim amount and payment/distribution on such allowed claim, that certain claims may likely increase because of interest and other. The Parties in good faith considered all such timing increase issues in arriving at the above claim estimates.

vi.   At closing, Purchaser shall pay the Purchase Price to the Seller in exchange for a Special Warranty Deed, by way of a Bankruptcy Court approved Section 363 sale. Purchaser agrees to purchase the Property "As Is, Where Is," with all faults, with no representations or warranties of any kind. Pursuant to the Bankruptcy Code, the Seller at closing will own the purchase price funds as a Debtor in Possession. The sales motion and order will contain greater detail of the sale and the "true-up" process. The

2

Bankruptcy Court may require that the Section 363 sale be accomplished through a Chapter 11 plan.

vii.    It is expressly understood and agreed to by the Purchaser that Seller retains all rights to its claims against Third Parties, including but not limited to all Seller's claims for breaches of contract, breaches of lease agreements, fraud, tortious interference with a contract, tortious interference with a prospective contract, and other causes of action Seller may have. The known claims are listed in the Seller's asset schedule as accounts receivable filed in conjunction with its Bankruptcy Petition.

viii.   After closing, Seller will timely object to the objectional proofs of claim as Seller deems appropriate and proper in fulfilling its fiduciary duties. Once the Bankruptcy Court rules on all asserted claim objections, the Purchase Price shall then be "trued-up" taking into consideration the timing of plan confirmation and distributions as may be then applicable.

ix.     Once all allowed claims are determined by the Bankruptcy Court, the "true-up" process will occur, which will either increase or decrease the Purchase Price for the purpose of causing the Seller to have sufficient funds received from Purchaser to pay and satisfy in full all allowed claims.

x.      Because of the Parties' sale terms and the required bankruptcy sales process, the Parties agree on $ 38,688,485.39 as the purchase price to be paid by or on behalf of Purchaser at closing to Seller which in good faith is presently believed to be in a sufficient dollar amount to enable the Seller to pay and satisfy all current and future anticipated allowed claims and resulting taxes in full and agree to the "true-up" process. While the "true-up" process will be greater defined and detailed in the sales pleadings, generally, the "true-up" process will result in one of three possible outcomes subject to Bankruptcy Court order -- (i) the ultimately all the allowed claims against the Seller are less than the purchase price paid at closing and the Purchaser would receive a refund of that difference; (ii) the ultimately all the allowed claims against the Seller are more than the purchase price paid at closing and the Purchaser must pay additional funds to the Seller of that difference; (iii) the ultimately all the allowed claims against the Seller are in the exact same dollar amount as the fixed purchase price paid at closing and no additional money is owed to or from either Party.

xi.     In addition to the Purchase Price to be received by Seller, Purchaser may convey at their sole authority and discretion equity or other value to the Seller's interest holders only after bankruptcy court approval as follows:

        (a) 1917 Ashland Equities, LLC;

        This equity conveyance and the like will be governed more specifically by separate documents.

3

xii.   The other equity interest holders, AMD Asset Holdings, LLC and Med Center Developers, LLP will not be conveyed any equity from Purchaser. By execution below by Dr. Dharmesh Patel and Robert Day, AMD Asset Holdings, LLC and Med Center Developers, LLP agree, acknowledge, and warrant that they will not receive any equity by virtue of this Agreement or the underlying sale of the Property, except to the extent that they may each separately own an equity interest in 1917 Ashland Equities, LLC.

xiii.   This is a binding enforceable contract. All Parties executing represent and warrant that they have the authority to sign in their respective entities' behalf, subject to Bankruptcy approval.

xiv.   The Parties expressly agree and acknowledge that the terms and agreement contained within this Purchase and Sale Agreement, as well as any and all Addendums to same, is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

The Effective Date of this Agreement is July 7, 2021:

Seller:

1917 Heights Hospital, LLC

By: _____, Manager   Date: 07/08/2021
Dharmesh Patel, M.D.

By: _____, Manager   Date: 7/8/2021
J. Robert Day

Purchaser:

Platinum Heights, LLC

By: _____, CEO   Date: 7-7-21
Ryan Cole CEO/Member

Platinum Team Management, Inc.

By: _____, President   Date: 7-7-21
Ryan Cole, President